IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| FLORA M. SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Nos. 2:19-cv-161-WKW-SMD |
| | ) | 2:19-cv-354-WKW-SMD |
| ALABAMA DEPARTMENT OF | ) | |
| HUMAN RESOURCES, | ) | |
| | ) | |
| Defendant. | ) | |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff Flora Scott ("Scott") asserts that her former employer, Defendant Alabama Department of Human Resources ("DHR"), retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1] Civil Act. No. 2:19-cv-161-WKW-SMD, *Am. Compl.* (Doc. 13) pp. 5-6; Civil Act. No. 2:19-cv-354-WKW-SMD, *Pl.'s Am. Compl.* (Doc. 11).[2] Before the Court is DHR's Motion for

---

[1] Federal courts are courts of limited jurisdiction. *Exxon Mobile Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005). As such, they have only the power to hear cases that they have been authorized to hear by the Constitution or Congress. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal courts have jurisdiction over two general types of cases: (1) cases that arise under federal law and (2) cases in which the amount in controversy exceeds $75,000 and there is diversity of citizenship among the parties. *Home Depo U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019). Courts presume that causes of action "lie[] outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377.

Here, Scott's complaint alleges violations of Title VII, which is a federal statute. As such, this case presents a federal question within this Court's original jurisdiction under 28 U.S.C. § 1331.

[2] Scott filed two suits in this Court stemming from two separate Equal Employment Opportunity Commission ("EEOC") charges. Civil Act. No. 2:19-cv-161-WKW-SMD, *Pl.'s Am. Compl.* (Doc. 13); Civil Act. No. 2:19-cv-354-WKW-SMD, *Pl.'s Am. Compl.* (Doc. 11). Because both of Scott's suits arise from the allegedly retaliatory actions of DHR, they have been consolidated by the Court. *Order* Civil Act. No. 2:19-cv-161-WKW-SMD (Doc. 12). As a housekeeping matter, the documents referenced within the

Summary Judgment. *Def.'s Mot.* (Doc. 64) p. 1. For the following reasons, the undersigned recommends that DHR's motion be granted and that Scott's retaliation claims be dismissed with prejudice.

I.  **UNDISPUTED MATERIAL FACTS**

Scott was employed as a financial support worker with DHR from October 2016 to November 2019. *Scott Dep.* (Doc. 61-1) p. 4. As part of her duties, Scott managed child support cases. *Id.* at 5. Between August 14-17, 2017, and again on August 30, 2017, Scott was allegedly harassed by one of DHR's clients to whom Scott was assigned as the case worker. *Id.* at 8-9. On August 18, 2017, August 31, 2017, and September 7, 2017, Scott filed internal incident reports with DHR reporting the client's conduct. *Id.*; *Pl.'s Ex.* (Doc. 74-2) pp. 1-3.

In December 2017, Scott closed the client's case at the client's request. *Scott Dep.* (Doc. 61-1) p. 9. The client's case was later reopened in April 2018. *Id.* After the case was reopened, the client attended a DHR group meeting on April 25, 2018, where she allegedly berated Scott, who was not present at the time. *Id.* After hearing about the incident from witnesses, Scott emailed DHR management that same day and complained that "nothing has been done to take action" regarding her previous reports of the client's behavior. *Id.* at 9-10; *Pl.'s Ex.* (Doc. 74-3) p. 1. The next day, Scott received an email stating that the matter "has been discussed with upper management" and that the August 2017 incident report "was submitted per agency procedures." *Pl.'s Ex.* (Doc. 74-3) p. 1. Unsatisfied with this

---

citations of this Recommendation appear on the 2:19-cv-161-WKW-SMD docket unless otherwise indicated.

response, Scott emailed management again on April 30, 2018, asserting that management had not contacted the client or followed DHR policy in handling the situation. *Pl.'s Ex.* (Doc. 74-6) p. 1. Scott received a response that day directing her to "contact law enforcement at any time, independent of DHR," if she felt threatened. *Id.*

Believing that DHR failed to take proper action as to her complaints, Scott filed a discrimination charge with the EEOC on June 26, 2018. *Scott Dep.* (Doc. 61-1) pp. 11-13. The Charge, which was characterized as sex discrimination, alleged that DHR created a hostile work environment by failing to address the client's harassing behavior. *EEOC Charge* (Doc. 74-9) pp. 1-3; *Scott Dep.* (Doc. 61-1) p. 13. Two days later, Scott informed DHR of her EEOC Charge. *Scott Dep.* (Doc. 61-1) p. 15.

On May 21, 2018—approximately five weeks *prior* to Scott filing the aforementioned EEOC Charge—DHR's upper management emailed Louis Slayton, Scott's direct supervisor, requesting that he provide them with the dates and times Scott called in during the last six months.[3] *Def.'s Ex.* (Doc. 62-5) p. 16. The next day, Slayton responded, listing the dates of sixteen call-ins (and noting that one of the call-ins required Scott's backup to attend a special hearing in her absence). *Id.* Based on this information, upper management directed Slayton to issue a counseling statement to Scott. *Id.* at 4, 16.[4]

---

[3] A call-in is not considered pre-planned leave. *Def.'s Ex.* (Doc. 62-5) p. 4. In the event of an emergency, a DHR employee may call in the morning of the absence. *Id.*; *Scott Dep.* (Doc. 61-1) p. 15. However, DHR's management contends that calling in "is expected to be only occasion[al], not routine." *Id.*

[4] As part of this process, Slayton originally drafted a warning, dated June 1, 2018, that was never issued to Scott. *Slayton Aff.* (Doc. 62-5) pp. 4, 19-20. Slayton indicated that he revised the warning, which was formal discipline to be retained in a personnel file, to a counseling statement, which was an informal disciplinary measure not to be retained in a personnel file. *Id.* at 4.

3

On July 25, 2018—approximately one month after Scott filed her EEOC charge and two months after DHR began reviewing Scott's absences—DHR supervisors met with Scott and issued her a counseling statement citing continued absences. *Pl.'s Ex.* (Doc. 74-22) p. 1. During that meeting, Scott allegedly spoke in a loud voice, indicated that the counseling statement was "junk," and informed management that, if her family needed her, she would continue to be absent because her family came first.[5] *Slayton Aff.* (Doc. 62-5) pp. 5-6; *Wright Aff.* (Doc. 62-7) p. 8. DHR perceived this behavior as insubordinate. *Slayton Aff.* (Doc. 62-5) p. 6; *Wright Aff.* (Doc. 62-7) p. 9; *Pl.'s Ex.* (Doc. 74-22) p. 2.

On July 26, 2018—the day after receiving the counseling statement for excessive absences—Scott, citing family matters, called out from work and incurred an additional unplanned absence. *Scott Dep.* (Doc. 61-1) p. 20. On that day, she returned to the EEOC where she was informed that her June 26 Charge had been misplaced. *Id.* Scott refiled the Charge. *Id.* at 14. The EEOC did not conduct an investigation on the June 26/July 26 Charge but, instead, issued Scott a right-to-sue notice that same day or the following day. *Id.* at 15.

On August 14, 2018—approximately three weeks after Scott's second visit to the EEOC—DHR issued a reprimand to Scott based on her excessive absenteeism and allegedly insubordinate behavior during the July 25 meeting. *Pl.'s Ex.* (Doc. 74-22) p. 2.

---

[5] Scott does not recall all of the events that occurred during this meeting. *Scott Dep.* (Doc. 61-1) pp. 16-22. She does, however, concede that she has "a loud voice" and that she told management that, if her family needed her, she "would be there for them." *Id.* at 18-19. She does not recall if she referred to the counseling statement specifically as junk. *Id.* at 22.

4

This reprimand resulted in points being deducted from Scott's yearly performance appraisal. *Id.*

On November 28, 2018—approximately fifteen weeks after the August 14 reprimand—Scott filed a second EEOC charge against DHR alleging that DHR retaliated against her for filing the June 26/July 26 EEOC charge. *EEOC Charge* (Doc. 1-1) p. 3. Specifically, Scott cited the July 25 counseling statement and two occasions on which DHR allegedly ignored her requests for leave. *Id.*[6] The EEOC notified DHR about the November 28 Charge the next day. *Def.'s Ex.* (Doc. 63-8) p. 2. Scott was issued a right-to-sue letter on December 6, 2018. *EEOC Letter* (Doc. 1-1) p. 1.

On December 11, 2018—approximately two weeks after Scott filed the November 28 EEOC Charge—DHR issued Scott another reprimand, this time for insubordination and poor job performance. *Pl.'s Ex.* (Doc. 74-22) p. 4. The reprimand was based in part on Scott's alleged failure to properly manage three client cases. *Id.* DHR noted that Scott was late in returning client calls and in following her supervisor's directives. *Id.* The reprimand was also based upon Scott's failure to meet DHR's weekly directive to scan ten case files. *Id.* The reprimand noted that Scott failed to meet the directive for sixty-two out of the sixty-eight weeks the policy had been in effect. *Id.* Scott was advised that points would be deducted from her next performance appraisal. *Id.*

On December 19, 2018, DHR conducted Scott's annual performance review. *Pl.'s Ex.* (Doc. 74-28) pp. 3-4. Scott was given a score of twenty for responsibility, which was

---

[6] Scott's leave requests were submitted on August 20, 2018, and October 9, 2018. *EEOC Charge* (Doc. 1-1) p. 3.

5

then reduced by seven points based on the August 14 and December 11 reprimands. *Id.* Scott's overall score of thirteen placed her within the "Partially Meets Standards" category. *Id.* at 3.

On February 26, 2019, Scott filed her third and final EEOC Charge against DHR, once again alleging retaliation. Civil Act. No. 2:19-cv-354-WKW-SMD, *EEOC Charge* (Doc. 1-2) p. 1. In this Charge, Scott stated that she believed DHR retaliated against her for filing the November 28 Charge when it issued her the December 11 reprimand. *Id.* She was issued a right-to-sue letter on March 13, 2019. *Id.* at 3; *Scott Dep.* (Doc. 61-1) p. 36.

## II. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing a motion for summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 707 (11th Cir. 2019).

To survive summary judgment, a nonmovant must assert facts that make a sufficient showing on every essential element of his case on which he bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Factual assertions must cite to specific

6

materials in the record, including affidavits, depositions, declarations, and interrogatory answers. FED. R. CIV. P. 56(c). Unsupported conclusions and factual allegations are insufficient to create a genuine issue of material fact. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Also insufficient are allegations based on speculation. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). Although pro se filings must be liberally construed, a pro se litigant must still establish, under the summary judgment standard, a genuine issue of material fact to avoid summary judgment on her claims. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *Augusta Iron & Steel Works, Inc. v. Emps. Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (per curiam); *Jackson v. Reese*, 608 F.2d 159, 160 (5th Cir. 1979).[7]

## III. DISCUSSION

Scott alleges that DHR began retaliating against her after she filed her June 26/July 26 EEOC charge. *Pl.'s Am. Compl.* (Doc. 13) ¶ 2 ("All allegations of retaliation followed the filing of [the July 26, 2018] charge of discrimination."). Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has made a charge" under Title VII. 42 U.S.C. § 2000e–3(a). Title VII's antiretaliation provision prohibits any employer action that "well might have dissuaded a reasonable worker from

---

[7] *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981).

making or supporting a charge of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020).

As here, when a plaintiff provides no direct evidence of unlawful retaliation, the burden-shifting framework established in *McDonnell Douglas*[8] governs the claim. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (per curiam). Under that framework, a plaintiff bears the initial burden to establish a prima facie case, which raises a "presumption that the [defendant's] adverse action was the product of an intent to retaliate." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). If a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, nondiscriminatory reason for its action. *Id.* Should a defendant meet this burden, the plaintiff must, to survive summary judgment, demonstrate that the defendant's proffered reason for its action was merely a pretext to mask retaliation. *Id.* Throughout this entire process, the ultimate burden of persuasion remains on the plaintiff. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).

Assuming arguendo that Scott has established prima facie cases of retaliation in both cases before this Court,[9] she has not shown, for the reasons set forth below, that DHR's legitimate, nondiscriminatory reasons for its actions are pretext.

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

[9] To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse action; and (3) there is some causal connection between the protected activity and the adverse action. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018).

Here, Scott filed EEOC charges on June 26/July 26, 2018; November 28, 2018; and February 26, 2019. *Scott Dep.* (Doc. 61-1) p. 11; *Pl.'s Ex.* (Doc. 74-9) pp. 1-2; *EEOC Charge* (Doc. 1-1) p. 3; Civil Act. No. 2:19-cv-354-WKW-SMD, *EEOC Charge* (Doc. 1-2) p. 1. Scott alleges that she suffered adverse actions on

### A. DHR has articulated legitimate, nondiscriminatory reasons for its actions.

Having assumed for purposes of this Recommendation that Scott has established prima facie cases of retaliation, the burden shifts to DHR to articulate "legitimate, nondiscriminatory reason(s) for its employment decision(s)." *Johnson*, 948 F.3d at 1325. A legitimate, nondiscriminatory reason is one that might motivate a reasonable employer to act. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001).

DHR states it took action against Scott based on excessive absenteeism, poor job performance, and insubordination. *Def.'s Mot.* (Doc. 64) pp. 10-16. These are all legitimate, nondiscriminatory reasons for DHR's actions. *See e.g., Duckworth v. Pilgrim's Pride Corp.*, 764 F. App'x 850, 854 (11th Cir. 2019) (finding that excessive, unexcused absenteeism is a legitimate, nondiscriminatory reason to terminate an employee); *Smelter v. S. Home Care Servs., Inc.*, 904 F.3d 1276, 1290 (11th Cir. 2018) (finding that poor job performance is a legitimate, nondiscriminatory reason to terminate an employee); *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1277 (11th Cir. 2020) (finding that insubordination is a legitimate, non-discriminatory reason to terminate an employee).

---

July 25, 2018 (counseling statement); August 14, 2018 (reprimand); December 11, 2018 (reprimand); and December 19, 2018 (yearly performance review). *Am. Compl.* (Doc. 13) ¶¶ 20, 23-25; Civil Action No. 2:19-cv-345-WKW-SMD, *Am. Compl.* (Doc. 11) ¶¶ 21-22, 23. For purposes of this Recommendation, the undersigned assumes without deciding that (1) Scott's EEOC Charges constitute protected activity; (2) DHR's alleged actions would have dissuaded a reasonable worker from making or supporting a charge of discrimination; and (3) Scott's protected activities and the adverse actions were not wholly unrelated.

9

### B.  Scott has not shown that DHR's legitimate, nondiscriminatory reasons are pretext.

Because DHR has offered legitimate, nondiscriminatory reasons for its actions, to survive summary judgment, Scott must show that these proffered reasons are merely pretext to mask retaliation. To establish the necessary causation, Scott must demonstrate that "her protected activity was a but-for cause of the alleged adverse action" by DHR. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (alteration in original) (quoting *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1349 (11th Cir. 2007)). In other words, Scott must prove that, had she not engaged in the protected conduct, DHR would not have disciplined her. *Id.* Scott may make this showing by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in DHR's proffered reasons for its actions that "a reasonable factfinder could find them unworthy of credence." *Gogel*, 967 F.3d at 1136. Importantly, a reason is not pretext for retaliation "unless it is shown *both* that [DHR's] reason was false, *and* that [retaliation] was the real reason" DHR acted. *Springer*, 509 F.3d at 1349 (emphasis in original). And, as noted above, it is Scott's "burden to provide evidence from which one could reasonably conclude that[,] but for her alleged protected act(s)," DHR would not have acted adversely towards her. *See Gogel*, 967 F.3d at 1136.

      i.  **Excessive Absenteeism**

DHR proffers that it issued the July 25 counseling statement and the August 14 reprimand to Scott based on excessive absenteeism. *Def.'s Mot.* (Doc. 64) pp. 11-16. Scott does not contest that the absences occurred but instead contends that "[n]o member of

management verbally expressed his/her concerns" regarding her absences prior to the July 25 counseling statement. *Pl.'s Resp.* (Doc. 74) p. 5. She also argues that DHR disciplined her differently than another employee with a similar attendance record. *Id.* at 11. As explained below, these arguments fail to establish pretext.

Regarding DHR's alleged failure to notify Scott that her absences were problematic, Scott provides the Court with two monthly counseling reports from May 2018 and June 2018. *Pl.'s Ex.* (Doc. 74-11) pp. 1-2. Admittedly, these reports do not specifically admonish Scott for excessive absences; however, both reports note the number of unplanned absences Scott incurred each month. *Id.* For example, the May report indicates that Scott incurred four unplanned absences and the June report indicates that she incurred six. *Id.* Clearly, then, Scott was aware (or should have been aware) that DHR was watching her unplanned absences before the July 25 counseling statement.

Additionally, Scott has not submitted any evidence showing that DHR was required to notify her that her absences were problematic prior to issuing a counseling statement. Thus, while Scott may quibble with whether DHR should have advised her that her absences were problematic before taking official action, she has not shown that DHR acted outside of their policies when issuing the July 25 counseling statement. *See Duckworth,* 764 F. App'x at 855 (rejecting employee's attempt to establish pretext based on his assertion that "he did not receive prior warnings about his absences" where the employer was not required to progressively discipline the employee).

As for DHR's alleged differential treatment, Scott points to the attendance record of F.G. *Pl.'s Ex.* (Doc. 74-23) pp. 1-7. During the seven-month period between January

11

2018 and July 2018,[10] F.G. was absent ten full days. *Id.* at 5. Five of those days were unplanned. *Id.* [11] During that same period, Scott was absent twenty-four full days. *Pl.'s Ex.* (Doc. 74-22) pp. 6-7; *Def.'s Ex.* (Doc. 63-2) p. 11. Of those days, twenty-one were unplanned. *Def.'s Ex.* (Doc. 63-2) p. 11.[12]

F.G.'s attendance record does not provide support for Scott's pretext analysis. Scott was absent fourteen more full days than F.G. and she incurred sixteen more unplanned absences than F.G. These are significant differences between the attendance records of Scott and F.G. Therefore, Scott's attempt to demonstrate pretext via comparator analysis with F.G. is not persuasive. *See Duckworth*, 764 F. App'x at 855 (finding that the employee's comparator analysis merely showed that the employer retained individuals who provided documentation or medical excuses for their absences and terminated those who did not).

In sum, Scott has not shown that DHR's disciplinary action based on excessive absenteeism is pretext for retaliation. Scott does not contend that she was not absent on the days DHR reports nor does she offer sufficient evidence to undermine the honesty of

---

[10] The undersigned has selected this timeframe for comparison because it provides data prior to Scott's July 25 counseling statement.

[11] An unplanned absence is defined as "failure for an employee to report to work when scheduled." *Pl.'s Ex.* (Doc. 74-22) p. 2; *Def.'s Ex.* (Doc. 61-1) p. 2. DHR requires an employee "to call-in and speak to their immediate supervisor when an unplanned absence is anticipated." *Pl.'s Ex.* (Doc. 74-21) p. 4.

[12] By the undersigned's count, Scott incurred twenty-three unplanned absences during this period. However, the undersigned will rely on DHR's interpretation of the data (which benefits Scott) that Scott incurred only twenty-one unplanned absences during this period.

DHR's decision to discipline her based on excessive absenteeism.[13] Accordingly, Scott has not shown that DHR's decision to discipline her based on absenteeism is pretext for retaliation.

### ii. Poor Job Performance

DHR contends that the December 11 reprimand—which resulted in points being deducted from Scott's December 19 yearly evaluation—was based on Scott's poor job

---

[13] Construing Scott's filings liberally, Scott attempts to show that DHR concocted the problem with her absences to disguise its retaliatory actions. *Pl.'s Resp.* (Doc. 74) pp. 6, 13. While she does not contend that the absences themselves were contrived, Scott asserts that DHR: (1) falsified a memorandum summarizing her absences, and (2) ignored her leave requests, which forced her to acquire unplanned absences. *Id.*

First, Scott asserts that DHR's June 1 warning memorandum (which was never issued to her) is fraudulent. *Id.* at 6; *Pl.'s Ex.* (Doc. 74-12) pp. 1-2. Scott notes that the memorandum lists several absences she incurred *after* the memorandum's creation date of June 1. *Pl.'s Resp.* (Doc. 74) p. 6. For example, the memorandum indicates that Scott was absent on June 18, 2018; June 22, 2018; June 26, 2018; and June 27, 2018. *Pl.'s Ex.* (Doc. 74-12) pp. 1-2. Scott contends that, on June 1, DHR could not have known that she would be absent those days thereby making the document fraudulent. *Pl's. Resp.* (Doc. 74) p. 6.

This discrepancy is explained by Louis Slayton, the memorandum's drafter. *Def.'s Ex.* (Doc. 62-5). In his affidavit, Slayton avers that Scott acquired additional absences after he began drafting the memorandum but before Scott was issued the July 25 counseling statement. *Id.* pp. 4-5. This could account for the fact that certain absences listed on the warning memorandum postdated its creation date.

Second, Scott contends that some of her absences should not be considered "unplanned" because DHR ignored her requests for leave. *Pl.'s Resp.* (Doc. 74) p. 13. Scott points to two occasions on which she claims DHR ignored her leave requests. Notably, both occasions occurred after July 2018. Therefore, even if Scott wrongly incurred unplanned absences because DHR ignored her requests, the undersigned's comparator analysis between Scott and F.G. (from January 2018-July 2018) is not undermined.

One of Scott's requests occurred on August 20, 2018, when she requested leave for an appointment on September 10, 2018. *Id.* DHR's records indicate that Scott took eight hours of leave that day, but the absence is not classified as unplanned. *Pl.'s Ex.* (Doc. 74-22) p. 7. Thus, regardless of whether DHR officially communicated with Scott regarding her request for leave, DHR did not classify this absence as unplanned.

Another request occurred on October 9, 2018, when Scott requested leave so that she could spend time with her family for Thanksgiving. *Pl.'s Resp.* (Doc. 74) p. 13; *Pl.'s Ex.* (Doc. 74-23) p. 2. In her deposition, Scott explained that, when DHR did not approve or deny her request, she called in those days. *Scott Dep.* (Doc. 61-1) p. 34. DHR's records indicate two unplanned absences as a result. *Pl.'s Ex.* (Doc. 74-22) p.7. Scott has provided no evidence showing that she was entitled to take the requested leave without formal approval. Thus, Scott's argument that DHR improperly classified her leave as unplanned is unavailing.

performance. *Def.'s Mot.* (Doc. 64) pp. 16-20. Specifically, DHR contends that Scott failed to scan ten case files per week, as required by DHR policy, and that she mismanaged three client cases. *Id.*

As for the scanning requirements, Scott acknowledges that she was unable to meet DHR's expectations. *Pl.'s Resp.* (Doc. 74) p. 10. Notably, Scott does not contend that DHR's expectations were applied only to her or only to employees engaging in protected activity. However, she asserts that DHR's "expectations" were merely "hope[s] or projection[s]," not responsibilities, and that she could not meet the expectations because she had an overwhelming workload. *Id.* Scott's attempt to distinguish an expectation from a responsibility does not show that DHR's proffered reason was false or that retaliation was the real reason DHR reprimanded her. Thus, Scott fails to establish pretext.

As for the alleged mismanagement of three client cases, Scott argues that she properly managed those cases[14] and that DHR falsely accused her of mismanagement to justify reducing her yearly evaluation score. *Pl.'s Resp.* (Doc. 74) p. 14. Scott's contention that she performed her job well, without more, is insufficient to show pretext. *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance."). Where, as here, an employer "produces performance reviews and other documentary evidence of

---

[14] Scott defended her decision to not contact client C.Y.—despite being directed to do so by her supervisor—because "the information was available for the supervisor to relay" and there "wasn't anything [DHR] could do for her." *Scott Dep.* (Doc. 61-1) p. 28. With regards to client J.W. (who complained that Scott was not returning her calls), Scott contends that "[t]here was no need for [her] to speak with [J.W.] since management had discussed the case already." *Pl.'s Ex.* (Doc. 74-14) p. 2. Finally, as for client L.W., Scott asserts that she returned L.W.'s call on October 9, which was four days after the client called on October 5. *Id.* at 3.

misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence." *Id.* Scott has provided no other evidence that DHR's decision to discipline her based on poor job performance was motivated by retaliation. Thus, Scott's self-serving assertion of a job well done is insufficient to show pretext.

### iii.   Insubordination

DHR contends that, in addition to excessive absenteeism, the August 14 reprimand was also based on insubordination. *Def.'s Mot.* (Doc. 64) pp. 13-16. Specifically, DHR asserts that Scott was insubordinate during the July 25 counseling statement meeting when she spoke in a loud and disruptive tone, referred to the counseling statement as "junk," and declared that she would continue to call out from work if her family needed her. *Id.* at 14-15. This conduct could be reasonably be interpreted as insubordinate by DHR.

Scott admits to speaking in a loud voice during the meeting and informing DHR management that she would continue to be absent if her family needed her. *Scott Dep.* (Doc. 61-1) pp. 16-22. However, Scott denies that her actions in the July 25 meeting constituted insubordination. *Id.* at 21-23. Standing alone, Scott's denial of insubordination is insufficient to show pretext. *See, e.g., Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (finding that the plaintiff's "self-serving assertion that she was not insubordinate does not alone establish that she was terminated because of her sex"); *Seldon v. Total Sys. Servs., Inc.*, 653 F. Supp. 2d 1349, 1381 (M.D. Ga. 2009) ("Standing alone, Plaintiff's subjective belief that she was not insubordinate and uncooperative and therefore did not deserve to be disciplined is insufficient to create a genuine issue of material fact

regarding pretext."). Scott has provided no other evidence that DHR's decision to discipline her based on insubordination was actually motivated by retaliation. As such, she has not shown pretext.

      **C.**    **The temporal proximity between Scott's protected activity and DHR's action does not establish pretext.**

Finally, the undersigned notes that close temporal proximity between an employee's protected activity and an employer's adverse action can, in some circumstances, constitute evidence of pretext. *Johnson*, 948 F.3d at 1328. However, without more, close temporal proximity is rarely sufficient to establish pretext. *Hulbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (holding that, although temporal proximity of two weeks is evidence of pretext, it is likely insufficient by itself to show pretext).

Here, the temporal proximity between several of Scott's EEOC filings and DHR's various adverse actions could be considered close. For example, Scott's July 25 counseling statement occurred approximately one month after she filed her June 26 EEOC Charge. Her August 14 reprimand occurred approximately three weeks after she refiled the June 26 EEOC charge on July 26. And, her December 11 reprimand occurred thirteen days after she filed her November 28 EEOC Charge. However, without any evidence indicating that DHR's proffered reasons for its actions were false or that retaliation was the real reason DHR acted, the undersigned cannot find that temporal proximity alone is sufficient to establish pretext. This is particularly true where Scott acknowledges that her absences occurred, concedes that she was unable to meet DHR's scanning expectations, and admits to some of the behavior that DHR interpreted as insubordinate during the July 25 meeting.

Accordingly, Scott has not established that DHR's proffered reasons are pretext for retaliation despite any potential close temporal proximity that exists between her protected activity and DHR's adverse actions.

## IV.    CONCLUSION

Scott's conclusory allegations of retaliation are insufficient to show that DHR's proffered legitimate, non-discriminatory reasons for its adverse actions were pretextual. Therefore, it is the

RECOMMENDATION of the undersigned that DHR's Motion for Summary Judgment (Doc. 64) be GRANTED and that Scott's claims of retaliation be DISMISSED WITH PREJUDICE.

It is ORDERED that the parties shall file any objections to this Recommendation on or before **August 4, 2021**. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which each objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation, and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1; *see also Stein v. Lanning Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982); *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 21st day of July, 2021.

/s/ Stephen M. Doyle
_____
Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE